UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20886-CR-UNGARO

UNITED STATES OF AMERICA

vs.

RENE SANABRIA-OROPEZA,
    Defendant.
_____/

## FACTUAL PROFFER

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt:

Beginning in the summer of 2010, a DEA confidential source ("CS 1") was approached by Marcelo Foronda and Jorge Sanchez. Foronda and Sanchez were drug traffickers who had access to cocaine producers in Bolivia. Foronda and Sanchez asked CS 1 to introduce them to the Colombian Drug Trafficking Organization (DTO) that Foronda and Sanchez believed CS 1 worked for. Foronda and Sanchez were hoping to sell the cocaine from their producers to the Colombian DTO for export out of Bolivia.

Foronda and Sanchez introduced CS 1 to Sanchez's brother, Colonel Milton Sanchez, who was the head of a unit of the Bolivian National Police Anti-Narcotics Directorate (FELCN) in Santa Cruz, Bolivia. Foronda and Sanchez told CS 1 that Colonel Sanchez and other Bolivian police authorities would provide protection to allow cocaine shipments to leave Bolivia through either the airport or the land border. CS 1 was also introduced to General Rene Sanabria, the former head of FELCN, and, at that time, the Chief of the Bolivian Intelligence Unit, CIGIEN. Sanabria also agreed

to provide protection for the cocaine shipment. CS 1 agreed to arrange a meeting with representatives of the Colombian DTO, who were really a DEA undercover agent and another confidential source ("CS 2"), in Chile.

On August 21, 2010, Jorge Sanchez, Colonel Milton Sanchez, General Sanabria, and CS 1 traveled from Bolivia to Arica, Chile. At a hotel in Arica, the four men met with the DEA undercover and CS 2. Surveillance of the meeting was conducted with the assistance of the Chilean National Police, and the meetings were audio and video recorded. During the meeting, Sanabria and Milton Sanchez met with the undercover and CS 2 separately, and they negotiated to protect the cocaine shipment as it left Bolivia for a price of $2,500 per kilogram of cocaine. **Sanabria stated that he could not negotiate the price of the cocaine, as that was Jorge Sanchez's responsibility which would have to be negotiated separately.** During the meeting, Sanabria stated that he had men at the airport who would allow the drugs to clear security. Sanabria also told CS 2 and the undercover agent that the drugs could be sent "above," with passengers, or "below," as passenger cargo.

When CS 2 and the undercover agent explained that the first shipment would be sent in a cargo container over land, Sanabria requested forty-eight hours to position men that he could trust at the border. This would ensure that the drugs went through the border undetected. In addition to the $250,000 Sanabria and Colonel Milton Sanchez would receive for protection, Sanabria requested an additional $10,000 to distribute to his men for allowing the drugs to pass through the border crossing. As the meeting concluded, the undercover agent and CS 2 gave Sanabria and Milton Sanchez $50,000 in United States Dollars.

Jorge Sanchez and CS 1 then met with the undercover and CS 2, and Jorge Sanchez agreed

to send 100 kilograms of cocaine via cargo container to the Port of Miami. The 100 kilograms represented a test load, at a price of $2,500 per kilogram of cocaine, in the hopes that other transportation routes, such as an airplane route, could later be established. Later that day, Jorge Sanchez met again with the undercover agent and CS 2, and Sanchez complained that he and Foronda would not make enough money unless they also invested in the cocaine load. Sanchez ultimately agreed to send a total of 100 kilograms of cocaine to the Port of Miami, with half of the load representing Sanchez and Foronda's investment. The explicit agreement was that of the fifty kilograms invested by Sanchez, fifteen would be used as payment for the unloading of the cocaine in Miami. The other thirty-five kilograms would be sold at a price of $22,000 per kilogram, which would be split evenly with Foronda and Sanchez.

Sanchez agreed to this and told CS 2 and the undercover agent that the drugs would arrive in a cargo container shipment of minerals. Sanchez also gave the undercover agent a piece of paper containing two bank account numbers in Hong Kong and the phone number for a person named "Diguenho Gonzalez." The undercover agent was to wire the money for the protection and the purchase of the cocaine to those accounts, where "Gonzalez" would have the money wired to other banks and ultimately, to Foronda and Sanchez in Bolivia. Jorge Sanchez, Colonel Milton Sanchez, General Sanabria, and CS 1 then returned to Bolivia.

Between August 29, 2010, and September 1, 2010, Foronda had a number of consensually recorded telephone conversations with CS 2. During these conversations, Foronda renegotiated the previous agreement that was made with Jorge Sanchez. Foronda ultimately agreed to send 150 kilograms of cocaine to the Port of Miami. The agreement with CS 2 was that the Colombian DTO would pay $2,500 for 100 kilograms of cocaine, and the additional fifty kilograms would represent

Foronda and Jorge Sanchez's investment in the cocaine shipment. Of those fifty kilograms, thirty-five would be sold on behalf of Foronda and Jorge Sanchez, where they would earn $14,000 per kilogram of cocaine.

On September 2, 2010, the DEA wired $260,000 to the two Hong Kong bank accounts provided by Jorge Sanchez at the Arica meeting. Of that money, $250,000 was for the purchase of the cocaine, and the additional $10,000 was intended for Sanabria to distribute among his men as he requested. **On September 11, 2010, the kilograms of cocaine were transported to Oruro, Bolivia, where Foronda, Jorge Sanchez, and CS 1 verified their arrival. On September 25, 2010, the cocaine was loaded into cargo container CMAU 1445058. The cocaine** was hidden in bags containing zinc rocks, and the container was sealed by a Bolivian Customs agent provided by Sanabria and Colonel Milton Sanchez. The container was then driven to the Bolivia-Chile border, where it crossed under the protection of General Sanabria and Colonel Sanchez. CS 2 and the undercover agent were provided with the bills of lading and the container number for the shipment.

Surveillance was established of the truck and container, with the assistance of the Chilean National Police, until the container reached the Port of Arica, Chile. Surveillance of the container was maintained at the port, until the container was loaded onto the Marine Vessel Esther Schulte on October 7, 2010. The container then traveled to the Port of Balboa, Panama, where it remained under surveillance until it was ultimately loaded onto the Marine Vessel CGM Marlin. On November 29, 2010, the CGM Marlin arrived in the Port of Miami. Cargo container CMAU 1445058 was pulled by Customs and Border Protection for inspection. The cargo seals from Bolivia were intact, and CBP and DEA recovered 144 kilograms of cocaine secreted in bags containing zinc

rocks.

On September 27, 2010, after the container successfully crossed into Chile, the DEA wired an additional $250,000, which represented the payment to Sanabria and Milton Sanchez for the protection of the shipment, to Hong Kong bank accounts provided by "Diguenho Gonzalez." **In consensually recorded phone conversations between CS 2 and Sanabria, Sanabria acknowledged that the money had arrived in Bolivia**. Additional payments were sent to a Hong Kong bank account as payment for Foronda and Jorge Sanchez's investment in the test load. In consensually recorded phone calls, Foronda acknowledged that this money had been received. Foronda and Sanabria agreed to meet again with CS 2 and the undercover in the Dominican Republic to discuss future shipments of cocaine from Bolivia to the United States. On February 24, 2011, Foronda and Sanabria were detained in Panama while awaiting a connecting flight to the Dominican Republic. Foronda and Sanabria were then expelled from Panama and arrested by the DEA at that time.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 6/24/11

By: _____
BRIAN DOBBINS
ASSISTANT UNITED STATES ATTORNEY

Date: 6/24/11

By: _____
SABRINA D. VORA-PUGLISI, ESQ.
ATTORNEY FOR DEFENDANT

Date: 6/24/11

By: _____
RENE SANABRIA-OROPEZA
DEFENDANT